ANNA WOMACK, Administratrix of the Estate of NELLIE WOMACK, v. MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant.—88 S. W. (2d) 368.

Division One, November 12, 1935.

*Thos. J. Cole* and *Dearmont, Spradling & Dalton* for appellant; *Edward J. White* of counsel.

*L. E. Tedrick* and *Phillips & Phillips* for respondent.

HYDE, C.—This is an action for wrongful death, on behalf of next of kin, under Section 3262, Revised Statutes 1929. Plaintiff's daughter, Nellie Womack, was killed by defendant's train on a public crossing in Butler County. The case was submitted only upon negligence under the humanitarian doctrine in failing to give warning of the approach of the train. Plaintiff recovered a verdict for $10,000, and from the judgment entered thereon defendant has appealed.

Defendant did not call the trainmen to the witness stand and offered no evidence except photographs and measurements, but contends that plaintiff's evidence was not sufficient to make a jury case. We will therefore consider the evidence from the viewpoint most favorable to plaintiff's contentions. Miss Womack was the teacher at a country schoolhouse located on the west side of plaintiff's right of way, which ran through that locality in a northerly direction. She stayed at the farm home of B. A. Stoecker, about 1000 feet east of the right of way. The day of the accident was the last day of school and there was to be a community dinner at the schoolhouse. Miss Womack started in her car, a Model A Ford coupe, about eight A. M. to make preparations. The road from the Stoecker house to the schoolhouse was a dirt road ("some sand and some gumbo"), which ran east and west. The railroad crossed it at almost a right angle. There had been about a one-inch rain during the night so that on the morning of the accident, the road was slick, muddy and full of ruts, "probably a foot to eighteen inches deep." Miss Womack started from the Stoecker house with two small Stoecker children and Mrs. Stoecker's daughter, Mrs. Crenshaw, then Mildred Porter. Miss Womack, driving, sat on the left side of the car; the side windows were open. Miss Porter was seated on the right side of the car and one of the Stoecker children was on Miss Porter's lap, the other seated between them. Only Miss Porter survived the accident and she testified to the course of the car and the actions of the driver before reaching the track. She was unconscious for some time after the accident.

The country on each side of the road was flat and defendant's track was on an embankment from three and one-half to four feet higher than the surrounding country. Beginning at a point about 1520 feet south of the crossing, there was timber which obscured the view of the track on the south. It was, however, possible to see south down the track as far as the timber after passing an orchard, on the south side of the road, about 400 feet east of the crossing. It was possible to see farther south on the track from points nearer the crossing. At fifty feet east the view was 4100 feet south. Near the edge of the right of way and about sixty feet east of the track, there were two trees, one nineteen inches in diameter and the other twenty-one inches in diameter. One tree was in the highway a little north

of the south highway fence, the other just south of this fence. These trees were close together and it was shown that they obscured the view of the track at that point so that they made a blind spot, for a few seconds, for a driver going west. There was a mudhole that morning on the right-hand side of the road about even with the two trees, so that "Miss Womack had to go around the mudhole on the left-hand side of the road and that put her over next to the two trees." Miss Porter testified that both she and Miss Womack looked south when they passed the orchard about 400 feet from the crossing; that they could see "down to the woods;" and that "the train hadn't come out of the woods." She said that she looked south again near the right of way when they "had not passed the two trees" and that Miss Womack was then "either looking or she was just turned around in that direction." She said that she "could see down to the scope of woods except the space where the two trees hid the view." Miss Porter also said that the next time she looked south the "front part of the car was on the track;" that then "the train was on the cattle guard;" that she "never heard the train sound any alarm;" and that Miss Womack had "looked twice to the south," the second time being before they passed the trees. Miss Porter further said that "the road was rather wet and rather muddy that morning;" that the mudhole was in the dirt part of the road and "might have been directly across from the right of way fence;" that Miss Womack was driving the automobile at about five miles per hour; and that "it continued at about the same rate of speed on up to the crossing."

The train was about an hour late and was running from sixty to sixty-five miles per hour. The engine was stopped about a quarter of a mile north of where it struck the automobile. The rise of the road to get over the track was shown by the following measurements: 70 feet east of the track, the road was 3.06 feet below the top of the rails; 60 feet east, it was 2.09 feet below; 50 feet east, it was 2.06 feet below; 40 feet east, it was 1.09 feet below; 30 feet east, it was 1.04 feet below; and 20 feet east, it was only six inches below. It had some gravel on it across the right of way, but "the roadway of the dump would be slick" and the pictures show ruts in it. It was shown that a car traveling five miles per hour could be stopped within two feet after putting on the brakes. A number of witnesses, who lived in the neighborhood, said they heard and saw the train. The testimony of these witnesses was that it whistled for a highway crossing south of the woods but did not whistle for the one where the accident occurred. There were two short alarm blasts blown near the crossing. According to some witnesses, these blasts were given when the train was one or two rail lengths from the crossing; according to others, they were after the engine was on the crossing and the automobile was in the air. One witness testified that he heard the train,

walked out from his house, and watched it come along. He said that he "could see in the engine when it went by, but didn't see the engineer in the cab" when the train passed his house, which was over a quarter of a mile south of the crossing. Another witness, who lived on the south side of the road about halfway between the Stoecker house and the crossing, testified that she heard the train coming and looked out of her window; that she had seen the automobile when it passed her house; that the car was getting near the right of way, when she first saw the train about halfway between the woods and the crossing; that she saw the engineer getting to this post; and that "he got up and sat down on the seat and jerked the whistle cord." She said, "I never saw the engineer until he was getting up on his seat as the train was getting up near the crossing, about 20 feet from the crossing." She also said, "the automobile was right on the crossing when the train gave the two blasts. It was just at the minute of the collision."

Did the showing of the above-stated facts amount to substantial evidence to warrant a finding that deceased drove onto defendant's track oblivious to the approach of the fast running train; and that defendant's engineer did or, by the exercise of ordinary care, could have seen that she was oblivious and was about to go into a position of imminent peril of being struck thereby, in sufficient time to have thereafter (after her obliviousness and purpose to continue immediately into a position of peril became reasonably apparent), with the means at hand, warned her soon enough so that she could have stopped before reaching a place where the train would strike her? Under the evidence here, this accident could not have been prevented by any warning, after deceased drove close enough to the track to be in the path of the train, because she then neither had time to get on across, nor to stop and back away. Plaintiff's evidence here also tends to show that defendant's engineer did not actually see deceased within time to give warning before the automobile got into a position of peril, because it was to the effect that he was not keeping a lookout for this crossing and was not even at his post where he could keep a lookout. It does show that there was nothing to prevent him from seeing the automobile all of the time it was traveling the last sixty feet (from the time it passed the two trees), during which time (about eight seconds) the train, going twelve times as fast as the automobile, traveled 720 feet.

"A failure to keep a lookout, *at a place where there is a duty to do so*, is not, under our Missouri humanitarian rule, any excuse for failing to prevent injury to one whose peril could have been discovered in time to prevent his injury if such a lookout had been kept. In other words, in spite of a failure to keep a lookout, the humanitarian doctrine may come into operation, not because that is in itself humanitarian negligence, but because we have, *at places*

*where there is a duty to keep a lookout,* extended the humanitarian rule to discoverable as well as discovered peril. . . . If there was a duty to keep a lookout, the question is could he have been seen in time if it had been kept, and not was a lookout kept.'' [Mayfield v. Kansas City Southern Ry. Co., 337 Mo. 79, 85 S. W. (2d) 116.] While the humanitarian doctrine "originally was based upon actual superior knowledge by the defendant of a plaintiff's peril,'' and in some jurisdictions still is (Mayfield case, supra, 85 S. W. (2d) l. c. 123; Restatement of Law of Torts, secs. 479-480), we have, in this State, definitely adopted the rule of applying it also to discoverable peril. Since proof of ability to see if a lookout was kept, would usually be circumstantial evidence tending to show that an engineer or driver did see, perhaps as a practical matter of application, in this age of rapid transportation, this rule of discoverable peril is justified. Anyhow, we are committed to it by a long line of decisions.

As said by this Court en Banc:

''The Missouri doctrine . . . applies . . . to an act of a plaintiff going into or continuing in peril, oblivious of the danger, though his being oblivious is due to his own negligence, and he could, if he would, avoid the impending danger. Thus in this State a person may heedlessly and deliberately approach and go across a railroad track with bowed or averted head, looking neither to the right nor the left, and oblivious to his surroundings, when, if he would but look, he would see a coming train and could avoid injury, yet, if the operator of the train sees, or by proper care would see, such person going into or continuing in the danger zone, but oblivious of the impending danger, though negligent in being so, he must use all proper care and means to avoid injuring him. In other words, he must not, if he can avoid it, run down or injure a careless man, though his very carelessness is an integral part of his peril, and he could, if he would, avert such peril. (Citing cases.) The Missouri rule . . . requires a person operating a dangerous instrumentality to use diligence in avoiding injury to a person whom he sees or could see in or going into peril.'' [Bollinger v. St. Louis-San Francisco Ry. Co., 334 Mo. 720, 67 S. W. (2d) 985, l. c. 990.]

Under our decisions, a public highway crossing is a place where an engineer, operating a locomotive towards it, has ''a continuous duty to keep a lookout every time the place is approached.'' ■ The evidence here was, therefore, sufficient to support a finding that the engineer could, by the exercise of ordinary care, have seen the automobile approaching so near the tracks as to be about to go into a position of imminent peril of being struck by the train, in time to have sounded a warning whistle before it had actually reached such a position. The evidence was also sufficient to show that deceased was actually oblivious to the approach of the train, which is an essential element of a humanitarian negligence case of failure to warn (Pentecost v. Terminal Railroad Co., 334 Mo. 572, 66 S. W.

(2d) 533), because Miss Porter testified that they did not expect, see, or hear it, because it was shown that the trees hid part of the track when they looked last, and because it was hardly reasonable to believe that the car would have been driven onto the track, under the circumstances, if she had not been oblivious. But these things were not enough to make a case of liability against defendant, in a case like this based upon the duty to warn for the purpose of preventing a person from going on immediately into a position of peril, unless it further appeared that deceased's obliviousness was sufficiently apparent that such obliviousness could have been known to the engineer if he had exercised ordinary care in keeping a lookout.

Explaining this proposition, in the Restatement of the Law of Torts, section 480, it is said: "It is not enough that the defendant should see the plaintiff in a position which would be dangerous were the plaintiff not aware of what is going on. The defendant must also realize or have reason to realize that the plaintiff is inattentive and, therefore, is in peril. The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if·he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing. However, it is not necessary that the circumstances be such as to convince the defendant that the plaintiff is inattentive and, therefore, in danger. It is enough that the circumstances are such as to indicate a reasonable chance that this is the case. Even such a chance that the plaintiff will not discover his peril is enough to require the defendant to make a reasonable effort to avoid injuring him. Therefore, if there is anything in the demeanor or conduct of the plaintiff which to a reasonable man in the defendant's position would indicate that the plaintiff is inattentive and, therefore, will or may not discover the approach of the train, the engineer must take such steps as a reasonable man would think necessary under the circumstances. If a train is at some little distance, the blowing of a whistle would ordinarily be enough, until it is apparent that the whistle is either unheard or disregarded."

In short, in such a situation, a defendant "to be free from negligence . . . must act on reasonable appearances and at a time when action would be effective." [Allen v. Kessler (Mo.), 64 S. W. (2d) 630; see, also, Martin v. Fehse, 331 Mo. 861, 55 S. W. (2d) 440;

Hart v. Weber (Mo.), 53 S. W. (2d) 914; Alexander v. St. L.-S. F. Railroad Co., 327 Mo. 1012, 38 S. W. (2d) 1023; Herrell v. St. L.-S. F. Railroad Co., 322 Mo. 551, 18 S. W. (2d) 481.]

█ Defendant's argument here is that plaintiff's case breaks at this point because there is no evidence to show that defendant's engineer could have known that deceased was oblivious to the approach of the train and intended to continue onto the track. It is pointed out that Miss Porter said that both she and Miss Womack looked south twice and, therefore, the engineer if he had seen them could reasonably believe that they saw the train. However, both of the times, when she said they looked, were before they passed the trees, at which time the train must have been at least 800 feet away, and the engineer then could hardly have seen which way they were looking. The car was not even coming into a position of peril, at that time, and this case must be decided upon the facts as they appeared, while the car was traveling the last sixty feet, from the trees to the track. Just where the danger zone commences, in any case where a person is proceeding toward the path of a fast moving train or automobile is usually a doubtful matter, and it is a question of fact for the jury under the circumstances of that particular case, if there is a reasonable question about it. [Homan v. Mo. Pac. Ry. Co., 334 Mo. 61, 64 S. W. (2d) 617; Iman v. Freund Bread Co., 332 Mo. 461, 58 S. W. (2d) 477; Kloeckener v. St. Louis Pub. Serv. Co., 331 Mo. 396, 53 S. W. (2d) 1043, and cases cited.] Since the speed of this automobile was only five miles per hour, defendant, citing Elkin v. St. Louis Pub. Serv. Co., 335 Mo. 951, 74 S. W. (2d) 600, argues that there could have been no appearance of any intention to drive onto the track. However, driving at five miles per hour on a level, smooth, dry, paved city street may be a very different thing from driving at the same rate of speed over a rough, slick, muddy, gumbo road full of deep ruts, coming around or through a large mudhole, and up a slick incline. Under such circumstances that might be almost the maximum speed which could be attained. Two recent muddy road cases, in which this court held that a case under the humanitarian doctrine was made for the jury, on a five mile per hour speed, are Hencke v. St. Louis & Hannibal Railroad Co.. 335 Mo. 393, 72 S. W. (2d) 798; Willhauck v. C., R. I. & P. Railroad Co., 332 Mo. 1165, 61 S. W. (2d) 336.]

What was there in the way of "reasonable appearances," after this automobile was approaching or going into a position of peril, to indicate that the driver was intent on pursuing her journey across the track oblivious to the oncoming train?

First: The evidence tends to show that after coming clearly into the view of the engineer (having passed the trees) when he was close enough to observe the occupants of the car that none of them looked toward the train. (Miss Porter looked just as they were getting onto the track.)

Second: The oral testimony and pictures in evidence tend to show that the road was in such condition that it might reasonably be inferred that the driver's close attention was required to stay on it and keep moving. It had only recently ceased raining so the engineer must have known that roads were wet and the jury would certainly know that the movements of an automobile traveling on a slick, muddy road are noticeably different from one on a smooth dry road, at the same rate of speed.

Third: The evidence tends to show that the car continued at the steady speed of five miles per hour all the way up the muddy incline, which made a rise of three feet in less than fifty feet.

We do not think that, under these circumstances, we can say that it was to the engineer "so plain, that average fair minded men cannot reasonably differ about it," that deceased did not appear oblivious to the oncoming train and did not show an intention on her part to continue across the track, after the car entered the right of way and continued up the incline at five miles per hour (during the time when she could have stopped short of the path of the train, if warned); but, on the contrary, we believe, and so hold, that "reasonable appearances," under this evidence, were such that, at least "there is ground for fair difference of opinion about it." [Homan v. Mo. Pac. Ry. Co., 334 Mo. 61, 64 S. W. (2d) 617; Logan v. C., B. & Q. Railroad Co., 300 Mo. 611, 254 S. W. 705; Ellis v. Metropolitan Street Ry. Co., 234 Mo. 657, 138 S. W. 23.] We, therefore, hold that the court correctly overruled defendant's demurrer to the evidence. Defendant has stated other assignments of error but does not brief or argue them, and they will, therefore, be considered as abandoned. [Johnson v. Schuchardt, 333 Mo. 781, 63 S. W. (2d) 17; Pence v. Kansas City Laundry Co., 332 Mo. 930; 59 S. W. (2d) 633; Wahl v. Cunningham, 332 Mo. 21, 56 S. W. (2d) 1052; Scott v. Mo. Pac. Railroad Co., 333 Mo. 374, 62 S. W. (2d) 834.]

The judgment is affirmed. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.